**Jorgen V. KIERULFF, Appellant,**

**v.**

**METROPOLITAN STEVEDORE COM-
PANY, Appellee.**

**No. 17638.**

United States Court of Appeals
Ninth Circuit.

March 26, 1963.

Rehearings Denied May 7, 1963.

See also 300 F.2d 614.

Ashley Stewart Orr, Los Angeles, Cal., Hopgood & Calimafde, and John M. Calimafde, New York City, for appellant.

R. Welton Whann, Robert M. McManigal, and Welton B. Whann, Los Angeles, Cal., and Jas. M. Naylor, San Francisco, Cal., for appellee.

Before CHAMBERS, BARNES and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

This is an action filed by appellant here (plaintiff below) for infringement of United States Patent No. 2,919,042, issued December 29, 1959. Application therefor was filed October 8, 1956. The invention related to a shiploading device [1] and, in particular, to a device for loading scrap metal in the hold of a ship. The answer set up defenses of invalidity,

---

1. The patent was denominated a "Travelling Ship-Loading Crane," which it is not to a layman; it is a "scrap-loader," and so called in the briefs.

license, lack of infringement, and laches constituting estoppel.

The invalidity was urged on several theories—the indefiniteness of language in *Claim* 1; *lack of invention; prior use; prior art,* etc. But primarily the appellee here (defendant below; hereinafter referred to as Metropolitan) relied upon two theories:

A. An oral license to Metropolitan from "National," [2] appellant's then employer and a claimed owner of the invention, and

B. An oral license or shop-right by reason of appellant's acquiescence in Metropolitan's building of the accused device,[3] to appellant's certain knowledge.[4]

The trial judge originally entered an order on March 20, 1961, granting partial summary judgment. A motion for reconsideration was granted and findings of fact, conclusions of law and judgment theretofor entered on March 21, 1961, were vacated and set aside on September 6, 1961, (after a full trial of all issues), pending the determination of the motion to reconsider.

On September 12, 1961, the trial judge made the following order:

"This cause having been tried and submitted for decision, and it appearing to the Court that plaintiff, in 1955, granted to defendant an implied license in the nature of a 'shop-right', namely, an irrevocable, non-exclusive, non-assignable right to make and use the machine described in the patent in suit, No. 2,919,042 (cf: United States v. Dubilier Condenser Corp., 289 U.S. 178, 187–189 [53 S.Ct. 554, 77 L.Ed. 1114] (1933)); De Forest [Radio, Telephone, & Telegraph] Co. v. United States, 273 U.S. 236, 241–242 [47 S.Ct. 366, 71 L.Ed. 625] (1927); Standard Parts Co. v. Peck, 264 U.S. 52, 59–60 [44 S.Ct. 239, 68 L. Ed. 560] (1924); Luckesn (sic) Steel Co. v. American Locomotive Co., 197 F.2d 939, 941 (2d Cir. 1952);

"Accordingly, findings of fact on the issue as to infringement, and conclusions of law and judgment dismissing the action are ordered in favor of defendants and against plaintiff, and will be lodged with the Clerk by attorneys for defendant within seven days, pursuant to Local Rule 7.

"IT IS FURTHER ORDERED that the Clerk this day serve copies of this Order by United States mail on the parties appearing in this cause."

A motion for reconsideration was made, and denied.[5] A timely appeal was

---

2. National Metal & Steel Corporation.

3. Tr. p. 469.

4. The device was commenced in August 1955 and completed in October or November 1955; delivery was on November 8, 1955; thus the defendant started building the accused device before and finished it after the plaintiff's application for his patent. We here need not go into the appellant's position that Metropolitan's draftsman, Shanley, testified he started work on designing the accused device on August 25, 1955, and produced a drawing bearing date August 1, 1955, a date appellant claims was patently false.

5. "ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION

"This cause again having come before the Court upon plaintiff's motion, filed September 15, 1961, for reconsideration of

the September 12, 1961, 'Order for Findings of Fact, Conclusions of Law and Judgment', and it still appearing to the Court, after considering plaintiff's motion and the written argument made in support thereof, that plaintiff, in 1955, granted to defendant an implied license in the nature of a 'shop-right', namely, an irrevocable, non-exclusive, non-assignable, royalty-free right to make and use the machine described in the patent in suit, and the Court being satisfied that the facts and the law and justice require that plaintiff's action be dismissed upon that ground, without reaching the issue as to whether the accused device built by defendant would otherwise constitute an infringement, and without reaching any of the issues raised as to validity;

"IT IS ORDERED that plaintiff's motion for reconsideration is hereby denied. * * *"

taken. Jurisdiction below rests on 35 U.S.C. § 1 et seq., and 28 U.S.C. § 1338; and here on 28 U.S.C. § 1291.

We need not reach the issues of validity of the patent, or lack of infringement in the ordinary sense of those terms, for both are assumed under the court's theory that appellee is entitled to a judgment because of its "shop-right," i. e., that an implied license arose when Kierulff observed a scrap loader of his design in use at the Metropolitan scrap yard and did not complain.

Appellant states that the appellee urged only a license to it from National (Brief, p. 22); but the case below was tried and argued on two theories: the implied oral license from National to Metropolitan, and the implied oral shop-right or license direct from Kierulff to Metropolitan. The latter theory was the one adopted by the trial judge as controlling, as both his orders of September 12, 1961, and September 18, 1961 specifically point out, and refer to the "implied license in the nature of a 'shop-right,' namely, an irrevocable, non-exclusive, non-assignable right to make and use the machine described in the patent in suit * * * granted to defendant."[6] (Emphasis added.) And a consideration of this defense to appellant's suit is all that is required of us, unless we disagree with the trial court and find it not controlling. In that event, it would be necessary to consider the other issues raised by appellant. Whether we could decide them on this appeal, or would be required to remand for further findings below need not be decided until we pass upon the first matter.

We note originally that the trial court did not say the implied license herein granted *was* a "shop-right," but was in the nature of such a thing. Perhaps the

leading case in this circuit on "shop-rights" is Gate-Way, Inc. v. Hillgren, D.C., 1949, 82 F.Supp. 546; affirmed without opinion, 9 Cir., 1950, 181 F.2d 1010. There Judge O'Connor stated that a shop-right is created by operation of law, and is not within the statute of frauds.

" 'The doctrine of the shop right is of equitable origin. The principle involved is that where an inventor or owner of an invention acquiesces in the use of the invention by another, particularly where he induces and assists in such use without demand for compensation or other notice of restriction of the right to continue, he will be deemed to have vested the user with an irrevocable, equitable license to use the invention. This situation between the inventor and employer might, of course, arise by mutual agreement, but generally the situation arises where the inventor *induces* his employer to proceed *and not only fails to object to the use, but stands by or assists*, while permitting his employer to assume expense and put himself in a position where it would be to his detriment to be compelled to relinquish further use of the invention [citing cases].' " Gate-Way, Inc. v. Hillgren, supra, at 555. (Emphasis added.)

The court below cited and relied primarily upon four cases, all of which support the general theory of a shop-right,[7] its limitations, its extent, and its origin "in the application of equitable principles."

"No formal granting of a license is necessary in order to give it effect. Any language * * * or any conduct on his part exhibited to another

---

6. "Most courts justify the shop-right in terms of estoppel; others use the language of 'implied contract.' The theory is relatively unimportant." Note; 20 Colum. L.Rev. 1172, 1175.

7. United States v. Dubilier Condenser Corp., 1933, 289 U.S. 178, 187–189, 53 S.Ct. 554, 77 L.Ed. 1114; De Forest

Radio, Telephone & Telegraph Co. v. United States, 1927, 273 U.S. 236, 241–242, 47 S.Ct. 366, 71 L.Ed. 625; Standard Parts Co. v. Peck, 1924, 264 U.S. 52, 59–60, 44 S.Ct. 239, 68 L.Ed. 560, (which gave more than a shop-right to the employer); Lukens Steel Co. v. American Locomotive Co., 2 Cir., 1952, 197 F.2d 939, 941.

from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort. Whether this constitutes a gratuitous license, or one for a reasonable compensation, must of course depend upon the circumstances; but the relation between the parties thereafter, in respect of any suit brought, must be held to be contractual and not based on unlawful invasion of the rights of the owner." De Forest Radio, Telephone, & Telegraph Co. v. United States, 1927, 273 U.S. 236 at 241, 47 S.Ct. 366 at 367.

In Lukens Steel Co. v. American Locomotive Co., 2 Cir., 1952, 197 F.2d 939, 941, the facts are somewhat similar to the instant case except that there the inventor (Lukens) had obtained a patent before impliedly giving American Locomotive Company authority to use the patented invention, and the latter knew of the existence of the patent at all times.

> " 'While it is generally true that questions of shop right arise between employer and employee, such right is not restricted alone to the case of an employer, as the doctrine is only a phase of the broad doctrine of estoppel. A shop right may arise through any permissive use of the invention, and *particularly so where the inventor instigates such use and participates in it.'* " (Citing Robinson on Patents, Vol. 2, p. 641 [8] and De Forest Co. v. United States, supra.) Gate-Way v. Hillgren, supra 82 F.Supp. at 555.

■ Under the facts disclosed by this case, we believe the ordinary rules of equitable estoppel apply. Equitable estoppel is of three classes—by matter of record (or res judicata); by matter of deed (or assignment); or by matter *in pais*—"the things done or the words spoken." [9]

An obvious element sometimes emphasized is that the party alleged to have been estopped must have acted or failed to act with knowledge, or constructive knowledge, of the actual facts.[10]

> "The vital principle [of equitable estoppel or estoppel *in pais*] is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice." Dickerson v. Colgrove, 100 U.S. 578 at 580, 25 L. Ed. 618.

In James v. Nelson, 9 Cir., 1937, 90 F.2d 910, at 917, we quoted with approval the foregoing, as well as the following:

> " 'The essential elements of estoppel, as applicable in this case, are: (1) Ignorance of the party claiming estoppel of the matter asserted; (2) silence concerning matter where there is a duty to speak amounting to misrepresentation or concealment of a material fact; (3) action by the party relying on the misrepresentation or concealment; and (4) damages resulting if the estoppel is denied.' " (Citing Nelson v. Chicago Mill & Lumber Corp., 8 Cir., 1935, 76 F.2d 17, 21, 100 A.L.R. 87, which in turn cites many cases.)

8. Robinson actually uses the word "induces" rather than "instigates," with reference to "any conduct" of the inventor which might be equitable estoppel.

9. See generally: Costa, J. A., Law of Inventing in Employment (1953); Biester-feld, C. H., Patent Law, 2d ed. (1949); 37 F.Pr. Dig—Master & Servant, Key 62(j), p. 397.

10. Biesterfeld, C. H., Patent Law, 2d ed. (1949), p. 182.

We examine the findings of fact to determine if the essential elements of estoppel *in pais* are present. They are, we summarize:

(1) Ignorance of the party claiming estoppel, here Metropolitan.

(2) Silence of Kierulff—

    a) under a *duty* to speak up

      i) misrepresenting or concealing a material fact.

(3) *Action* by Metropolitan, the relying party

(4) to its *damage* if doctrine of estoppel is not invoked.

This issue is raised by Specification of Error, A 2. in Appellant's Brief, to-wit: [11]

"The Court erred in holding an implied license, i. e., a license by estoppel, because appellant, at the time of seeing his invention being used by appellee, had no enforcible patent right, had not even an inchoate right, and had no duty to complain; further appellee had not relied on appellant's silence, and had not changed its position in any way whatever."

As to *ignorance* of Metropolitan, the point is not raised by appellant. Nor can he well do so, for if Kierulff admittedly then had no patent right, and not even an inchoate right in and to the invention, it is difficult to see how Metropolitan could be required to anticipate that he had it, or might later make a claim he had it. Finding 22 finds support in the evidence.[12]

As to Metropolitan's *action*, the court found it did act, in reliance on the alleged silence of the required nature. This action is "found" in Findings 10, 12, 13, 14, 16 and 17.[13] We find in the

[11]. And in Points 11 to 13(a) to (i), inclusive, in the Points on Appeal.

[12]. "22. Defendant did not know that plaintiff claimed any rights in and to the shiploading structures shown in Exhibits AM, BD, BE, and in the patent in suit No. 2,919,042, and in plaintiff's Exhibit 4, until January, 1960, and believed that the permission granted to it by National gave it the complete right to make and use the shiploading structures shown in Exhibits AM, BD and BE, and in the patent in suit No. 2,919,042."

[13]. "10. In July or August of 1955, T. W. Buchholz and Ray Ponsen, another employee of defendant, entered the National premises to see and observe the National shiploading structures shown in Exhibits AM, BD and BE. At the time of said visit plaintiff was present, knew the nature and purpose of the visit, had the opportunity to inform Messrs. Buchholz and/or Ponsen that he objected to their seeing and observing the said shiploading structures, but failed to do so.

    *    *    *    *    *

"12. A few days after the invitation referred to in Finding 11, Messrs. Buchholz and Ponsen entered the National premises to see and observe the National shiploading structures shown in Exhibits AM, BD and BE in operation. At this time plaintiff was present, knew the nature and purpose of the visit, had the opportunity to inform Messrs. Buchholz and/or Ponsen that he objected to their seeing and observing the National shiploading structures shown in Exhibits AM, BD and BE in operation, but failed to so do.

"13. A few days after the visit referred to in Finding 12, National gave T. W. Buchholz permission to send his fabricators to the National premises to sketch the National shiploading structures shown in Exhibits AM, BD and BE, and shown in the patent in suit No. 2,919,042. At this time National gave T. W. Buchholz permission to build and use shiploading structures of the designs of the National shiploading structures shown in Exhibits AM, BD, and BE, and shown in the patent in suit No. 2,919,042. Plaintiff was fully aware of the fact that National had given defendant permission to make and use shiploading structures of the designs of the National shiploading structures shown in Exhibits AM, BD and BE, and shown in the patent in suit No. 2,919,042, and had the opportunity to inform the defendant, its officers, agents, or employees of his objections thereto and assert his rights in and to said shiploading structures, but failed to so do.

"14. A few days after the events referred to in Finding 13, Robert H. Shanley, an engineer employed by Wilmington Welding & Boiler Works, acting as agent and on behalf of defendant, together with Ray Ponsen, were admitted on to the National premises and were permitted to make drawings of the National shiploading structures shown in Exhibits AM, BD

record substantial, though disputed, evidence to support such findings.

As to *damage* to Metropolitan, we find no specific finding as such, but substantial expense and resulting damage is inherent in various findings, particularly Finding 16 (see note 12, supra). There is substantial evidence to support such finding.

We then come to Kierulff's *silence*. It is undisputed that he was silent.[14] But was he silent at a time when he was under a duty to speak up, which act was of such a nature that it amounted to a misrepresentation or concealment of a material fact? The trial court found he was.[15]

It seems to us the appellant is faced with a dilemma. If appellant "had no enforcible right, in fact not even an inchoate right, at the time he witnessed the use of his invention," (Br. p. 33)

and as inventor or discoverer "has no exclusive right to it against the public, or anyone who discovers it by fair means," then he had no duty to speak up because he had nothing to speak of or for—no claim to make.

But to prevail here he now must claim he had something—an invention—not a patent—a property right which was capable of being unlawfully appropriated. Chief Justice Taney stated that this "right" represents an inchoate right, which may (at the inventor's choice) be perfected by subsequently obtaining a patent; i. e., the inventor has a lawful right to obtain a subsequent perfect legal title, if he can do so. Gayler v. Wilder, 1850, 10 How. 477, 51 U.S. 477, 492, 13 L.Ed. 504.[16]

Why did Kierulff not file an application *before* October 8, 1956?[17] While the findings (10 to 18) are not as precise as

---

and BE, and shown in the patent in suit No. 2,919,042. Plaintiff was fully aware of the presence of Messrs. Shanley and Ponsen, of the nature and purpose of their visit, and was in a position to inform them that he objected to their making drawings of said shiploading structures, but failed to so do.

\* \* \* \* \*

"16. In August or September of 1955, defendant placed an order with Wilmington Welding & Boiler Works for the construction of three shiploading structures. In October of 1955, Wilmington Welding & Boiler Works sold and delivered to defendant three shiploading structures shown in plaintiff's Exhibit 4. Plaintiff knew that three shiploading structures shown in plaintiff's Exhibit 4 had been sold and delivered to defendant, and that defendant *intended to use said* shiploading structures in the ordinary course of its business, but failed to state any objection thereto.

"17. In December of 1955, or January of 1956, plaintiff and Joseph Schapiro, president of National, visited the defendant's premises and observed the defendant's shiploading structures shown in plaintiff's Exhibit 4. At this time, plaintiff expressed an objection to defendant making, using or continuing to use said shiploading structures."

14. See Findings 10, 12, 13, 14, 16 and 17, quoted in note 13, supra.

15. See note 13, supra.

16. We recognize that in Gayler v. Wilder, supra, Wilder had acquired from its inventor all rights to the "Salamander Safe" *subsequent* to the filing of an application for letters patent. But this seems a matter of degree only, with respect to the inchoate "right" that the inventor seeks to protect. It does not ripen into a legal title until the patent is granted.

17. We realize appellant, had he given notice in July 1955 of his claimed right to an invention for which no application had been made, might have "called the dogs" down upon him. Had he given notice after he had filed an application, and no matter when he filed it, he would have "invited interferences and other contests." Mills Novelty Co. v. Monarch Tool & Mfg. Co., 6 Cir., 1931, 49 F.2d 28, 29. There may have been no obligation upon Kierulff "to give the defendants notice of infringement, before the patent issued," Mills, supra, but if he failed to take any action when he knew "his" invention was being copied and used by others, he took a calculated business risk in not upsetting the applecart, while he put his own apples in better order. This is particularly so when he knew, or should have known, that National, his then employer had at least a shop-right in anything Kierulff had invented, and hence could not lawfully assign any part thereof to Metropolitan, or give permission for use of the machine. Amdyco Corp. v.

might be hoped for, it appears that July or August 1955[18] was the time Metropolitan's officer Buchholz (whether "invited" or not) first saw the machine which was the subject matter of the patent in suit. It had been built by Modern Crane & Conveyor Company, and delivered to National in July 1955.[19] It was an improvement over the two machines (jury rigs) ordered in May and delivered on June 19, 1955,[20] which Buchholz also saw in July and August 1955. At various periods of a "few days," "after July or August 1955," the acts related in the findings took place without complaint or protest by Kierulff. The precise dates are not found, nor do we think they are controlling. After two periods of "a few days," "after July or August 1955," Kierulff knew that not only was Metropolitan looking at "his" machine, it had obtained permission to build and make designs of the machine from National.[21]

Appellant cites but two cases in support of his position there was no duty on Kierulff's part to protest, and that the theory of equitable estoppel should be rejected.

In M'Millin v. Barclay, 1871, 16 Fed. Cas. 302, alleged infringement took place after the inventor had filed his application, and the court found a lack of evidence of any statement, or act, of the inventor that might estop.

In McWilliams Mfg. Co. v. Blundell, 1 Cir., 1882, 11 F. 419, the defendants were sued as infringers, immediately after the reissue of a defective original patent, under which the use was made. There the court properly held that "no prior use under the defective patent can authorize the use of the invention after the issuing of the renewed patent." We

agree, but do not find the case persuasive here.

The finding of estoppel, by silence, is one of fact, and not a conclusion of law. Gill v. United States, 1895, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480. Conduct proving acquiescence to the use of the invention, says Gill, can constitute consent. Also, in the Gill case, the conduct took place, as here, *before* the application for a license was filed. (Id., 160 U.S. 433, 16 S.Ct. 325.)

We hold Gill v. United States, supra, as enlarged by Gate-Way v. Hillgren, supra, is controlling in this case, under the factual findings of the district court. We affirm the court's decision that plaintiff granted defendant by his action and lack of action an implied license by estoppel, somewhat in the nature of a shop-right, irrevocable, non-exclusive, non-assignable and royalty free, to make and use the machine alleged to have infringed the patent in suit.

This license applies only to the machine or machines in operation at the time or before the patent was granted, and appellee may repair them during their normal life. If it appears to appellant that the validity of the patent must be expressly determined in order to safeguard this aspect of the result, we will remand this action to the district court for the limited purpose of having that court determine such issue. (This assumes it has not already done so impliedly by reaching its conclusion that an implied license has been granted to a valid and otherwise infringed patent, as argued by appellant. Opening Brief, p. 32.)

Appellant may within 30 days move for a remand for determination of the

Urquhart, D.C., 1930, 39 F.2d 943, 3 Cir., 51 F.2d 1072, certiorari denied, 1931, 284 U.S. 689, 52 S.Ct. 265, 76 L. Ed. 582.

18. Finding 9.

19. Finding 8.

20. Finding 6.

21. We recognize that this is disputed factually by appellant, but the facts are in conflict and were decided by the trial court unfavorably to appellant. We cannot and will not interfere with that decision, nor attempt to weigh facts and credibility of witnesses.

validity of the patent in which event our judgment shall not be deemed final until the remand and the district court's action thereon has become final. If the appellant indicates he does not desire a remand, a simple judgment of affirmance will be entered.